**UNITED STATES of America,**
**Plaintiff,**

v.

**OTTER TAIL POWER COMPANY,**
**Defendant.**

**No. 6–69–Civ–139.**

United States District Court,
D. Minnesota,
Sixth Division.

Sept. 9, 1971.

Kenneth C. Anderson, William Jaeger and Barry McNeil, Washington, D. C., for plaintiff.

Cyrus Field and David Lundeen, Fergus Falls, Minn., for defendant.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

In this action brought under Section 2 of the Sherman Act the basic issue is whether the acts of Otter Tail Power Company, a Minnesota public utility, in refusing to sell electric power at wholesale, and refusing to wheel electric power to municipalities it formerly served at retail, constitute a monopolization of commerce in violation of the Act.

The Sherman Act, Section 2, provides:

"Every person who shall monopolize, or attempt to monopolize * * * any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor * * *, 15 U.S.C. § 2.

Under Section 4 of the Act the United States District Court is vested with jurisdiction to restrain violations of the law. 15 U.S.C. § 4. Plaintiff seeks such an injunction.

Defendant Otter Tail Power Company with headquarters at Fergus Falls, Minnesota, is an investor-owned utility primarily serving small towns in western Minnesota and eastern North and South Dakota. Its business is almost exclusively retail. Its operation consists of an integrated power system running the full gamut from initial production to final sale of electrical power combined with pool arrangements which supply emergency power reserves.

From time to time citizens of some of the municipalities served by defendant have worked for the establishment of municipally owned electric facilities. Otter Tail has opposed such movements and has refused to sell power at wholesale, or to "wheel"[1] power, to its former municipal customers who have converted or who seek to convert to municipal systems. Plaintiff claims, this violates the Sherman Act. Defendant asserts this is but the exercise of proper business judgment aimed at protecting the integrity of its business.

The pleadings more particularly shape the issue. The government alleges that Otter Tail has sought to prevent the municipalities from shifting local electric service from defendant to other electric power systems, supplied either by Otter Tail or another supplier of power, by the following acts:

1. By refusing and threatening to refuse to sell power at wholesale to the proposed alternative local electric power system;

2. By refusing and threatening to refuse to wheel electric power from other wholesale suppliers to the proposed alternative local electric power system; and

3. By engaging in other activities designed to obstruct and defeat the attempt by municipalities to establish alternative local electric power system.

Otter Tail specifically denies that it has done anything in violation of Section 2 of the Sherman Act. In its Answer, paragraph IV, it

"admits and alleges that it has refused to permit the use of Otter Tail's facilities (by furnishing either wholesale or wheeling service) to subsidize or support a new municipal electric system which is constructed for the purpose of ousting Otter Tail from the retail electric business in that municipality. Otter Tail also admits and alleges that it has attempted to use all reasonable means to continue in business, and to continue to furnish adequate and reliable service at reasonable rates at retail in the municipalities which are served by its integrated

[1]. Wheel means to transport power for another supplier.

system, and in attempting to present its case that it is to their advantage not to sever their connection with Otter Tail's system and service."

The case was tried to the court June 1 through June 14, 1971. The parties stipulated to many of the facts. Plaintiff called eleven witnesses, the defendant three. Several extensive pretrial conferences preceded trial.

A summary of the facts essential to an understanding of the issue follows:

Otter Tail was incorporated in Minnesota in 1910. Its service area encompasses western Minnesota, northeastern South Dakota and eastern North Dakota. The company's integrated system consists of approximately 5,900 miles of interstate transmission lines which serve at retail, approximately 465 towns, mostly small communities of under 1,500 population. In 1969 Otter Tail sold 1,158,329 kilowatts (Kw.) of power to 103,829 customers, deriving a total operating revenue of $31,191,000. Otter Tail had a net generation capacity of 271,145 Kw. in 1969.

Otter Tail has entered into interconnection contracts with other electric systems. These contracts provide means by which the company can obtain power to supplement that provided by its own generation and sell excess power to others. One of Otter Tail's interconnections is with the United States Bureau of Reclamation. The relationship between the Bureau and Otter Tail is reflected in a comprehensive agreement which dates back to 1950. Pursuant to this contract, Otter Tail purchases a considerable volume of dump and secondary power from the Bureau.

Otter Tail is also directly interconnected with Minnesota Power and Light, Northern States Power Company, Northwestern Public Service Company, Montana-Dakota Utilities Company, Minnkota Power Cooperative, Central Power Association, United Power Association and several smaller rural electric cooperatives.

Generally speaking, Otter Tail provides retail service to municipalities pursuant to franchise agreements awarded to it by the city or town. By state law in each of the three states the franchises are non-exclusive and, depending upon the state, the franchise terms are limited to periods ranging from ten to twenty years. The franchises customarily grant Otter Tail the right to construct and maintain electric distribution systems and necessary transmission lines, and operate these within the regulations and provisions imposed by the municipal government.

Otter Tail also regularly engages in the business of wheeling power. A large proportion of Otter Tail's wheeling activity is done pursuant to its contractual relationship with the Bureau of Reclamation. Beginning in the 1930's, Congress appropriated funds for the construction of a series of hydroelectric generation facilities along the Missouri River in Montana, North Dakota and South Dakota. The Bureau of Reclamation of the Department of the Interior handles the marketing of the power generated by the facilities. Congress mandated that public bodies, REA electric cooperatives and municipal electric systems be designated as preference customers for this power; that it, that they be given first option to purchase the power.

The Congress also appropriated funds for the construction of high voltage transmission lines to transport Bureau power from the hydroelectric sites to the areas where the power was to be marketed.

In 1950 Otter Tail and the Bureau entered into the detailed contract which provided, *inter alia*, for the sale of dump power to Otter Tail and for the wheeling of Bureau power across Otter Tail transmission lines to preference customers. The Bureau pays a set wheeling fee to Otter Tail for this service. At the request of Otter Tail, a renewal contract dated June 14, 1955 contained language which, in the defendant's view, exempted it from any obligation to wheel power

to towns which it previously had served at retail. Otter Tail does wheel power to 18 municipal preference customers which it has not previously served at retail. More background facts will be recited in connection with the court's consideration of the issues.

The principal thrust of the government's case is that Otter Tail has a monopoly on the retail distribution and sale of power to towns in its operating area. It is not contended that defendant acted illegally or improperly in *achieving* this claimed monopoly position but rather in its actions seeking to *preserve* this position. Specifically, it is urged that Otter Tail's refusal to sell or wheel power to towns desiring to establish municipal systems, and its actions participating in local municipal power political campaigns, and sponsoring, encouraging, and financially supporting court litigation are all intended to impede and frustrate attempts to establish independent municipal electric systems.

Otter Tail does not deny its refusal to sell or wheel power to municipalities which it formerly served at retail but argues that to supply power to these municipalities would aid in its own demise. It admits its participation in local municipal political campaigns and in litigation surrounding attempts to establish municipal systems but contends this is proper and legal conduct. Such actions were taken, defendant argues, to preserve the electric power free enterprise system for the benefit of its customers, shareholders and employees.

*Otter Tail denies that it has a monopoly, is attempting to preserve a monopoly, or that it possesses a dominate share of the pertinent market under Sherman Act principles.* Defendant points to the many other electric power entities operating in the same area, particularly the United States Bureau of Reclamation, many electric cooperatives, Northern States Power Company, and other private power sources, from one or more of which electric power and the means of transmitting this power are readily available to those municipalities which defendant does not choose to serve.

Otter Tail finally urges a "Rule of Reason" and argues that its conduct is fully justified by its legitimate right to fight for its corporate life, remain viable in serving the public and prevent the erosion of its integrated system and the impairment of its credit.

■ A monopoly condemned by the Sherman Act is the power to fix prices or exclude competition coupled with policies designed to use or preserve that power. The United States Supreme Court in its most recent decision on the question, United States v. Grinnell Corp., 384 U.S. 563, 570, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), said:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development of a superior product, business acumen, or historic accident.

The two principal questions involved are: (1) Does Otter Tail possess monopoly power, and (2) Has it sought to maintain that power?

■ The term relevant market consists of both a product market and a geographic market. *Grinnell*, supra. It is not disputed here that the product market is the sale of electric power at retail. Indeed more than 90% of Otter Tail's income is from retail sales.

There is dispute as to the definition of the geographic market. The government contends that each of the 465 towns served by Otter Tail constitutes a separate geographic market. If this not be accepted, the government urges that the geographic market is, at least, the towns in the Otter Tail service area.

There is some logical basis for considering each town a separate geographic market; but viewing it in a broader light, there are, in the Otter Tail service area, 465 towns served by Otter Tail

and 45 towns served by municipal electric systems. On this basis it may be concluded that Otter Tail services approximately 91% of the relevant geographical market, certainly enough to justify the inference that the defendant possesses monopoly power in the area.

■ There are also 105 towns served by rural cooperatives in the Otter Tail service area. Because of congressional restrictions upon REA loans to cooperatives, seeking to serve urban areas, it is doubtful that the 105 towns could be viewed as competitive and hence considered in determining Otter Tail's share of the total relevant market. But even if these 105 are considered as part of the market, the result still has Otter Tail serving 465 of the 615 towns in the area. This is 75.6 percent of the relevant market. In our view this percentage is sufficient to justify the inference that Otter Tail possesses monopoly power in the area.[2]

Having found that Otter Tail does possess monopoly power, the second question is whether Otter Tail has sought to *maintain* that power. A principal contention of the government is that the defendant has been able to maintain this power because of its strategic dominance of transmission capacity in most of the Otter Tail area.

Several map exhibits in evidence reflect a maze of electric power lines covering, almost blanketing it would seem, the entire Otter Tail service area. Defendant urges that its transmission lines represent only 8% of the transmission lines of all power suppliers in the area.

Evidence at trial showed that electric power lines fall into three general categories:

(1) *Bulk power supply lines*, usually of a voltage of 115 Kv. or greater, which are intended to move large blocks of power from generating facilities to load centers.

(2) *Subtransmission lines*, usually of a voltage from 34.5 Kv. to 69 Kv. These are utilized to move power from the bulk power source to local retail distribution systems.

(3) *Distribution lines*, usually of a voltage of 12.5 Kv. or less, which move the power from the subtransmission network station to the ultimate consumer.

Most of the bulk supply lines in the Otter Tail area are owned and operated by the Bureau of Reclamation. The Bureau does not maintain its own subtransmission system but contracts with Otter Tail, and others, to transmit the power from bulk supply stations over their subtransmission lines to local retail distribution systems whence it is stepped down for delivery via distribution lines to customers.

About two-thirds of Otter Tail's total electric line mileage, or 4,036 miles, consists of 41.6 Kv. subtransmission lines. It appears that Otter Tail is dominate in operation of subtransmission lines in the area.

The contract between Otter Tail and the Bureau contains a provision [Para. 27(e) (2)] which Otter Tail interprets as meaning that it need not wheel Bureau power over its subtransmission lines to its former retail customers. Otter Tail refuses to do so, the Bureau does not have its own subtransmission lines to use for that purpose and the transmission lines of others are not readily available in the area sought to be served. Hence many potential preference customers of the Bureau, including municipalities, are unable to obtain Bureau power because of the absence of available subtransmission lines and the refusal of Otter Tail to wheel that power over its lines. It is not economically feasible or

2. (1) American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); (2) United States v. United Shoe Machinery Corp., 110 F. Supp. 295 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); (3) United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); (4) United States v. E. I. du Pont de Nemours & Co. (Cellophane), 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

practical for a municipality to construct its own subtransmission lines.

In support of its argument that Otter Tail does not have a dominance of transmission facilities, defendant showed at trial that 87,000 miles of electric power lines in the Otter Tail service area are owned by various rural distribution electric cooperatives. This testimony and other evidence established, however, that most of these lines are of a voltage of 12.5 Kv. and hence suitable only for *distribution* to the customer and not for *transmission*, which requires a heavier voltage, in the range of 34 to 69 Kv.

One of defendant's witnesses at trial, Mr. Nye, testified that the 12.5 Kv. cooperative lines in the vicinity of *Elbow Lake* and *Hankinson*, (two municipalities here involved and concerning which more will be said later) were not capable of transmitting power to these towns.

Northern States Power Company (NSP) does distribute retail power in some towns near the Otter Tail service area but it refuses to supply power to towns not in its own service area. For this reason NSP refused to supply Alexandria, Minnesota, and Colman, South Dakota. Hence NSP is not an available power source for municipalities refused service by Otter Tail and desiring to convert to municipal ownership.

We conclude that Otter Tail has a *strategic dominance in the transmission* of power in most of its service area.

Much of the evidence at trial was directed to the claimed employment of this dominance in transmission to prevent municipalities in the area from obtaining power to operate municipally owned systems. The testimony dealt principally with five towns, Elbow Lake, Minnesota, Hankinson and Finley, North Dakota, and Colman and Aurora, South Dakota, with the emphasis on happenings at Elbow Lake and Hankinson. A summary of events at each of these towns follows:

Elbow Lake, Minnesota, is a small county seat near Fergus Falls. Elbow Lake was served at retail by Otter Tail until 1966 when the citizens voted for a municipally owned system. The defendant refused to furnish power at wholesale. Elbow Lake acquired its own generating plant. It sought stand-by power from Otter Tail which was refused. Litigation ensued. The Federal Power Commission ordered the defendant to furnish stand-by power. The Court of Appeals of the Eighth Circuit affirmed. *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970).

When Otter Tail refused to sell power to Elbow Lake, the town sought power, either as a sole source or on a stand-by basis, from the Bureau of Reclamation, the United Power Association, the Basin Electric Power Cooperative and the Runestone Electric Association.

Each of these sources was willing and able to furnish the power, but could not, as the power could only be delivered to Elbow Lake over Otter Tail's transmission lines, because of the restrictive provisions contained in the contracts between Otter Tail and the suppliers previously discussed, and because of Otter Tail's refusal to wheel the power. It was, and is economically unfeasible, for either Elbow Lake or the suppliers to build the required transmission facilities from the power source to Elbow Lake.

From all of the evidence, of which this is a short precis, the court concludes that Otter Tail employed its dominance in transmission in the Elbow Lake area to prevent Elbow Lake from obtaining electric power from outside sources of supply.

Otter Tail served Hankinson, North Dakota, with electric power under a 20-year franchise dated February 16, 1931. In 1947 the voters of Hankinson approved the establishment of a municipal electric system. Otter Tail refused to sell power at wholesale to Hankinson. The town sought power from the United States Bureau of Reclamation, the Basin Electric Power Cooperative and the RSR Electric Cooperatives. All three of these suppliers were dependent on the use of Otter Tail's transmission lines in trans-

porting power from the nearest Bureau substation at Forman, North Dakota, some 39 miles from Hankinson. Otter Tail refused to wheel power over its lines to Hankinson. Again, it was not feasible for Hankinson to construct its own transmission line 39 miles to Forman. The Bureau was unable to do so for the same reason, with the result that Otter Tail's conduct prevented Hankinson from obtaining needed power to service a municipally owned system. The town abandoned its efforts and granted a new retail franchise to the defendant.

■■ On the basis of the above the court finds that defendant has a monopoly in the relevant market and has consistently refused to deal with municipalities which desired to establish municipally owned systems on the alleged justification that to do so would impair its position of dominance in selling power at retail to towns in its service area. The court concludes that this conduct is prohibited by the Sherman Act. It is well established that the unilateral refusal to deal with another, motivated by a purpose to preserve a monopoly position, is illegal. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

Here the defendant does not dispute that its purpose in refusing to deal with municipalities desiring to establish municipally owned systems is to protect itself in the position it now enjoys in the area. Such is a monopoly position, and the law prohibits conduct such as this when such is intended to preserve the monopoly.

A similar "refusal to deal" case was decided in this district in 1945, United States v. Klearflax Linen Looms, Inc., 63 F.Supp. 32, 39 (D.Minn.1945). There Judge Nordbye capsulized the legal principle involved when he held that "A refusal to sell, while it may be lawful *per se*, cannot be used in order to achieve an illegal result."

Here Otter Tail refuses to sell power to municipalities which would thereby take retail power business from defendant and refuses to wheel power for others willing to sell to these municipalities. Because of its dominant position Otter Tail is able to deprive towns of the benefits of competition which would result from municipally owned facilities.

Pertinent to an examination of the law is a reference to cases expressive of the "bottleneck theory" of antitrust law. This theory reflects in essence that it is an illegal restraint of trade for a party to foreclose others from the use of a scarce facility. Here the theory finds application in Otter Tail's use of its subtransmission lines. One authority believes:

"The Sherman Act requires that where facilities cannot practically be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms." [3]

This statement epitomizes the holdings in federal cases which have established the principle: United States v. Terminal Railroad Assoc., 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); Gamco, Inc. v. Providence Fruit & Produce Building Inc., 194 F.2d 484 (1st Cir. 1952); Packaged Programs, Inc. v. Westinghouse Broadcasting Co., 255 F.2d 708 (3rd Cir. 1958); Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 365 F.2d 478 (5th Cir. 1966).

The bottleneck principle is applicable to Otter Tail. Its control over transmission facilities in much of its service area gives it substantial effective control over potential competition from municipal ownership. By its refusal to sell or wheel power, defendant prevents that competition from surfacing.

## COURT LITIGATION

The efforts of Elbow Lake, Hankinson, Aurora and Colman, South Dakota, to es-

---

3. A. D. Neale, The Antitrust Laws of the U.S.A., Cambridge University Press at 67 (1960).

tablish municipal power systems were opposed by the defendant in court proceedings. Otter Tail either instituted or sponsored and financially supported court litigation which had the effect of frustrating the sale of revenue bonds to finance the municipal systems. A "no-litigation certificate," reflecting the absence of litigation which might impair the salability of revenue bonds, is essential to a successful sale of municipal bonds. The pendency of litigation has the effect of preventing the marketing of the necessary bonds thus preventing the establishment of a municipal system.

Most of the litigation sponsored by the defendant was carried to the highest available appellate court and although all of it was unsuccessful on the merits,[4] the institution and maintenance of it had the effect of halting, or appreciably slowing, efforts for municipal ownership. The delay thus occasioned and the large financial burden imposed on the towns' limited treasury dampened local enthusiasm for public ownership. In some instances, Otter Tail made offers to the towns to absorb the towns' costs and expenses, and enhance the quality of its service in exchange for a new franchise. Hankinson, after several years of abortive effort, accepted this type of offer and renewed defendant's franchise.

While every person has the right to resort to the courts to redress claimed wrongs, the right is not without limitation. One who enjoys a monopoly may not resort to litigation for the purpose of illegally maintaining the monopoly. The Ninth Circuit has observed that " * * litigation can be an integral part of a scheme prohibited by the Sherman Act." Trucking Unlimited v. California Motor Transport Co., 432 F.2d 755, 760 (9th Cir. 1970).

This legal principle is well established and has been expressed in patent cases particularly in connection with the institution of infringement suits. *See* Walker Process Equipment Inc. v. Food Machinery & Chemical Co., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Plastic Contact Lens Co. v. Butterfield, 366 F.2d 388 (9th Cir. 1966); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416, 424 (10th Cir. 1952).

In *Kobe,* supra, the court said:

" * * * we must not permit the courts to be a vehicle for maintaining and carrying out an unlawful monopoly which has for its purpose the elimination and prevention of competition."

The court finds that the litigation sponsored by defendant was instituted for the purpose of delaying and preventing the establishment of municipal electric systems with the expectation that this would preserve its predominant position in the sale and transmission of electric power in the area.

Defendant urges that the so-called *Noerr* doctrine, Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), exempts its conduct in the field of court litigation from antitrust attack.

But the *Noerr* principle is applicable only to efforts aimed at influencing the legislative and executive branches of the government. It only immunizes political activity directed toward the enactment and enforcement of the laws from antitrust attack. See *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir. 1971), and Trucking Unlimited v. California Motor Transport Co., supra. *Noerr* does not free from antitrust sanctions the institution of court litigation.

From all of the evidence it appears that defendant, by refusing to deal with municipalities and by conducting or sponsoring court litigation, has violated Section 2 of the Sherman Act and monopolized or attempted to monopolize the sale of electric power in its service area.

---

4. With the possible exception of litigation in Aurora where the court held that Otter Tail had no standing to sue.

## IMMUNITY AS A RESULT OF "VALID GOVERNMENT ACTION"

But Otter Tail takes the position that since it contracted with government agencies with reference to the delivery of power, it is thereby immune from antitrust sanctions.

It will be recalled that Otter Tail's agreement with the Bureau of Reclamation contains a provision which defendant interprets as freeing it from any obligation to wheel power from the Bureau to any municipality which received retail service from Otter Tail as of the date of the contract, that is, June 14, 1955. Further, Otter Tail's transmission agreements with certain cooperatives (Cooperative Power Association, Lyon-Lincoln Electric Cooperative, Inc. and Traverse Electric Cooperative, Inc., RSR Electric Cooperative, Inc. and East River Cooperative, Inc.) contain provisions which prohibit the use of defendant's transmission system to supply power from the cooperatives to a retail customer served by Otter Tail. These contracts also extend the same prohibition with respect to customers served by the cooperatives.

It is urged by Otter Tail that these restrictive provisions are immune from antitrust attack. The gist of this contention seems to be that since the Bureau is a government instrumentality and the REA administrator approved the contracts with the cooperatives, the contracts are the result of "valid governmental action," thus falling within the scope of Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672 (5th Cir. 1968).

In my view there is no merit in this contention. The *Alabama Power* case is inapposite. The restrictive provisions here are, in reality, territorial allocation schemes. Agreements among competitors to allocate customers or territories are *per se* violations of the Sherman Antitrust Act. Northern Pacific Railroad v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Our Eighth Circuit has held to the same effect. Montana-Dakota Utilities Co. v. Williams Electric Cooperative, Inc., 263 F.2d 431 (8th Cir. 1959). There the court condemned a contract provision between an investor-owned utility and a rural electric cooperative allocating marketing territories as a *per se* antitrust violation. The court said:

> By the great weight of authority in this country, the rule has been promulgated and consistently applied that contracts between quasi-public corporations, having for their object the division of territory between such companies, are against public policy, and being so, are absolutely void, untempered by any application of the 'rule of reason.' *Montana-Dakota Utilities* at 434.

A recent decision of the Court of Appeals for the District of Columbia Circuit, Hecht v. Pro-Football, Inc., 444 F. 2d 931 (D.C. Cir. 1971) held that a public armory board, in leasing a public stadium to a professional football team exclusively for a period of 30 years, was not immune from the antitrust laws.

In *Hecht*, the court held that in order for antitrust immunity to attach to action by a governmental body there must be specific and unequivocal language to this effect in the enabling statute.

> "The basic philosophy of our antitrust policy has been so long established, is of such recognized economic importance, and has assumed in the statutory scheme of things such high dignity that a contrary congressional intent of 'immunity from antitrust laws 'is not lightly implied'.'" *Hecht* at 935.

There is nothing in any of the legislation under which either the Bureau of Reclamation markets its power or the rural electric cooperatives operate which either expressly or impliedly confers immunity from antitrust laws upon the actions of the Bureau in negotiating contracts for sale of power or upon the action of the REA administrator in approving contracts between a cooperative and a private power company.

The record reflects it was reluctantly, and only after a determination that no other transmission facilities were available, that the Bureau signed the contract with defendant which contained the restrictive provision in question. In addition, the Bureau interpretation of the contract varies from that of the defendant. The Bureau officials were and are of the view that the provision is not a blanket restriction but requires the defendant to give separate consideration and to reach separate judgment as to each applicant for transmission service over defendant's lines.

▇ In order for antitrust immunity to attach in situations of this kind there must be a clear indication that Congress, in enacting the law, considered the competing interests of antitrust policies and whatever policy is best served by the other competing interest, and expressed a clear judgment that the antitrust policy should be suspended. There is no such showing here. No antitrust immunity attached to the contracts or to the parties executing them.

That which defendant refers to as the "heart of the case" is its argument that if Otter Tail is required to sell power at wholesale or wheel power to its former retail customers, it will be contributing to its own corporate death because more and more municipalities would then change to municipal ownership to obtain the cheaper Bureau power. Eventually, defendant claims, most of its customers would convert and the Otter Tail system would be eroded to the detriment of its customers, stockholders and employees. This argument was pressed hard by defendant and its president, Albert Hartl, who testified vigorously and eloquently in defense of privately owned utilities vis-a-vis public power interests.

▇ Of course, it should be remembered that a public utility which operates without exclusive franchises from its customers does not have a right to be free of competition. Rural Electrification Administration v. Central Louisiana Electric Company, 354 F.2d 859 (5th Cir. 1966). This has long been the law and extends to competition from municipally owned facilities. Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938).

One principal purpose of the Sherman Act is to insure competition. Otter Tail cannot violate the law albeit its avowed purpose is to protect the integrity of its business.

The Supreme Court recently held that the Schwinn Bicycle Company could not employ anti-competitive methods in order to preserve its business which was gradually but markedly going downhill. United States v. Arnold Schwinn and Co., 388 U.S. 365, 375, 87 S.Ct. 1856, 1663, 18 L.Ed.2d 1249 (1967). The court said:

"The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct."

So here there appears to be no legal justification for conduct which violates the Sherman Act.

A so-called "erosion study" (DX 41) offered by defendant sought to foretell its financial disaster if it is required to serve its former customers which convert to municipal operation.

The pessimistic view of the matter suggested by the defendant is not supported by the record. The Bureau of Reclamation now furnishes power to only two towns previously served by Otter Tail, to wit, Colman and Aurora, South Dakota. Elbow Lake also has an allocation of power for future use. The Bureau's generating capacity is now fully committed, it has denied requests for allocation of power from several applicants, including Sioux City and Aurelia, Iowa, and no new generating capacity is scheduled to be activated. It is not unlikely that some present Bureau customers will have to find a continued power source elsewhere. All in all, it does not appear that Bureau of Reclamation power is a serious threat to the defendant nor that it will be in the foreseeable future.

But regardless, as stated, even the threat of losing business does not justify or excuse violating the law.

The court finds from a preponderance of the evidence that the defendant has attempted to monopolize, and has monopolized, interstate commerce in the retail distribution of electric power in violation of Section 2 of the Sherman Act.

Now therefore, the defendant and its agents are enjoined from any and all conduct, whether expressed in terms of contracts, policies, or practices, having the effect of continuing the violations of the Sherman Act herein found to exist.

Plaintiffs' counsel shall promptly present suggested detailed Findings of Fact, Conclusions of Law and Order for Judgment reflective of these expressions together with a form of Judgment.