CITY OF MALDEN,
MISSOURI, Appellant,

v.

UNION ELECTRIC COMPANY and
Missouri Utilities Company,
Appellees.

CITY OF MALDEN,
MISSOURI, Appellant,

v.

UNION ELECTRIC COMPANY and
Missouri Utilities Company,
Appellees.

Nos. 88–2129, 88–2399.

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1989.

Decided Oct. 6, 1989.

Charles F. Wheatley, Jr., Annapolis, Md., for appellant.

Jay A. Summerville, St. Louis, Mo., for appellees.

Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Plaintiff, the City of Malden, Missouri, appeals from the district court's [1] entry of judgment in favor of defendants Union Electric Company and its wholly-owned subsidiary, Missouri Utilities Company, in this antitrust action challenging defendants' refusal to transmit power to plaintiff under a favorable tariff the city had negotiated with Missouri Utilities. Plaintiff claims the jury's verdict in favor of defendants is against the great weight of the evidence, the trial court's instructions to the jury were erroneous, and defense counsel's prejudicial remarks in closing argument require a new trial. Plaintiff further contends it should have been awarded its attorney's fees in connection with a motion for preliminary relief filed at the beginning of the litigation. We affirm.

## I. FACTUAL BACKGROUND

Malden owns and operates its own electric generation system and distributes electricity to industrial, commercial, and residential customers in its southeastern Missouri service area. Malden does not have the generating capacity to meet all of its electrical needs. In 1969, Malden entered into an agreement to purchase electricity at a wholesale rate from Missouri Utilities to supplement its own generation facilities.

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. By consent of the parties, the trial in this matter was conducted by United States Magistrate David D. Noce.

Missouri Utilities and Union Electric at that time owned the only transmission line which directly connected to the city of Malden, although Malden was surrounded by the service territories of rural electrical cooperatives and other municipal utilities.

Prior to October 1, 1979, the expiration date of Malden's contract with Missouri Utilities, Malden inquired about the possibility of Missouri Utilities "wheeling" or transmitting power to Malden from another generation source.[2] At that time, Missouri Utilities had never wheeled power to anyone and had no wheeling rate or billing provisions, but suggested wheeling would be a proper subject of negotiations.

While the parties attempted to agree to a new contract, Missouri Utilities continued to supply power to Malden under a "sales for resale" tariff known as the SFR–1. The SFR–1 rate included a "demand charge" to recover Union Electric's demand charge to Missouri Utilities,[3] a charge for recovering Missouri Utilities' investments in transmission, and an energy charge for recovering the cost of purchased power and electrical losses. Malden incurred the demand charge only if it took power during peak periods. It could avoid the charge by generating its own power or by obtaining power from a different source during peak times. Malden's contract with Missouri Utilities contained a "ratchet" feature, so that any demand charge remained in effect for the month in which it was incurred as well as for the eleven succeeding months.

In the negotiations for a new contract, Malden stated that it wanted off-peak power under the SFR–1 rate and wheeling service from SWPA to Malden. Missouri Util-

ities contended that wheeling in conjunction with the SFR–1 rate would not allow it to recover its costs, and in 1981 provided Malden with a proposed wheeling rate and two firm power prices. Malden chose to negotiate for continued service under the SFR–1 tariff, and requested an agreement which provided for an initial term of one year and which was terminable by either party with six months' written notice. This agreement was signed in December, 1981, and was approved by the Federal Energy Regulatory Commission (FERC) on February 16, 1982.

In 1983, Union Electric announced a proposed merger with its wholly-owned subsidiaries, including Missouri Utilities. In April, Malden again requested that SWPA power be wheeled as of January 1, 1984. Missouri Utilities responded that it would provide wheeling service, but not in conjunction with the SFR–1 rate. Negotiations continued, and in October, 1983, Union Electric sent Malden a draft agreement contemplating interruptible power and wheeling at rates for both pre- and post-merger services.

After receiving comments from counsel for Malden, a revised agreement was sent to Malden on November 4, 1983. That same day, Malden filed suit against Missouri Utilities and Union Electric, alleging the utilities' refusal to wheel violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. On November 17, Malden filed a motion for a preliminary injunction requiring defendants to wheel electric power to Malden effective January 1, 1984. In late November, the parties agreed to file the proposed Novem-

2. One of the specific sources mentioned at the time was the Southwestern Power Administration (SWPA), which had been delegated the authority to dispose of surplus energy produced at federal water projects. Municipalities such as Malden are given preference in the sale of this power, and SWPA informed Malden in 1978 that it would be entitled to receive 5000 kilowatts of preference power upon completion of the Truman Dam project. Malden's SWPA allocation would be withdrawn, however, if it did not have adequate transmission facilities or agreements to transmit the power in place by January 1, 1984.

Another alternative power source, which Malden claims was available and was mentioned orally to Missouri Utilities, was the City of Springfield, Missouri.

3. Missouri Utilities initially had its own generation facilities, but subsequently began purchasing substantially all of its power from Union Electric. Union Electric charged Missouri Utilities a demand charge during times of peak demand to compensate for the fixed costs necessary to construct and maintain the facilities to supply the necessary power during peak periods.

ber 4 agreement with FERC to allow the contract to go into effect as of January 1, 1984, subject to the city's right to challenge the proposed interruptible rates. Because of this agreement, Malden's motion for preliminary relief was neither heard nor ruled upon by the district court.

On December 19, FERC approved the merger of Union Electric and its subsidiaries effective January 1, 1984, rejecting Malden's challenge to the merger and noting the city could raise its concerns about rates when Union Electric proposed a rate change. In response to Malden's request that approval of the merger be conditioned on Union Electric filing a general wheeling rate for the city, the agency stated simply that appropriate procedures and standards for requesting a compulsory wheeling order existed under sections 211 and 212 of the Federal Power Act, should such an order become necessary. Shortly after the merger became effective, Malden paid Union Electric for power based on an interruptible W–4 rate. At the time of trial, Malden was constructing its own interchange with the SWPA.

## II. PLAINTIFF'S BOTTLENECK THEORY OF LIABILITY

The case went to trial based on Malden's claim that the city was entitled to damages under section 2 of the Sherman Act [4] for Missouri Utilities' refusal to wheel power to Malden. Malden claimed Missouri Utilities had a "bottleneck" monopoly on transmission facilities and had refused to wheel power to Malden from Springfield, Missouri, from 1979 to 1983.

■ Under the "bottleneck" or essential facilities doctrine, those in possession of facilities which cannot practically be duplicated must share the facilities with their competitors on fair terms. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1519 (10th Cir.1984), *aff'd on other grounds,* 472 U.S. 585, 105 S.Ct.

2847, 86 L.Ed.2d 467 (1985); *MCI Communications v. AT & T,* 708 F.2d 1081, 1132 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Hecht v. Pro–Football, Inc.,* 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 61 (D.Minn.1971), *aff'd,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

■ The doctrine requires (1) control of an essential facility by a monopolist; (2) the inability to practically or economically duplicate the facility; and (3) the unreasonable denial of the use of the facility to a competitor when such use is economically and technically feasible. *Aspen Highlands,* 738 F.2d at 1520; *MCI,* 708 F.2d at 1132–33; *Hecht,* 570 F.2d at 992–93. Plaintiff sought to prove in this case that Missouri Utilities' transmission line was an "essential facility" which defendants had refused to share fairly with Malden.

At trial, the parties disputed both whether Missouri Utilities' transmission line was the only practical means for Malden to obtain outside power and whether the conditions on access to the line imposed by Missouri Utilities were reasonable. Defendants' witnesses testified that other feasible alternatives for transmission of power included connecting with neighboring facilities owned by SWPA, M & A Cooperative, and Arkansas Power & Light Company. Plaintiff contended none of these alternatives were economically feasible because they would all result in the city paying more for power than Malden paid to Missouri Utilities under the SFR–1 rate.

Defendants' expert witness testified Malden's SFR–1 rate was very favorable, that Union Electric actually lost money when it was selling power through Missouri Utilities to Malden, and that Malden paid substantially less for power than all other sim-

---

**4.** Section 2 prohibits the monopolization and attempted monopolization of trade or commerce. 15 U.S.C. § 2. The offense of monopoly under section 2 has two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or main-

tenance of that power as distinguished from the growth or development of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

ilarly situated municipalities in the region with the exception of the cities of Jackson and Kennett, both of which also purchased power from Missouri Utilities at the SFR-1 rate. Defendants' expert concluded Malden did have available, economical alternatives, but conceded these alternatives would be more expensive to the city than wheeling in conjunction with the SFR-1 rate.

In answers to special interrogatories, the jury found that, during the years 1979 through 1983, Missouri Utilities controlled the only existing electric transmission line capable of conveying power to the City of Malden's electrical system,[5] but that Malden could have economically provided for an alternative transmission system to convey electrical power. In finding that reasonable alternatives to Missouri Utilities' transmission line existed, the jury rejected plaintiff's claim that the line constituted an "essential facility" over which defendants exercised monopoly power.

The jury further found that in response to plaintiff's specific request for wheeling (1) Missouri Utilities had not unconditionally or unreasonably refused to wheel power to Malden; (2) Missouri Utilities could not economically wheel power to Malden; and (3) Missouri Utilities had not acted with specific intent to deprive Malden of electric power with which to compete with Missouri Utilities. The district court denied Malden's motion for a new trial, and entered judgment against the city based on the jury's verdict.

After trial, Malden filed a motion for attorney's fees, contending that it had "substantially prevailed" on a major issue in that defendants had agreed to wheel SWPA power as of January 1, 1984, only after the city had filed its motion for preliminary relief. The district court denied the motion, stating plaintiff had failed to persuade the court that the lawsuit, rather than the parties' "long antecedent business negotiations," had resulted in the provision of wheeling after January 1, 1984.

Malden has appealed both from the judgment entered on the jury's verdict and

from the order denying its request for attorney's fees.

## III. PLAINTIFF'S REQUEST FOR A NEW TRIAL

Plaintiff raises numerous contentions in support of its request that a new trial be granted in this case, the first of which is that the jury's verdict is against the great weight of the evidence.

### A. The Jury's Verdict

■ In determining if a verdict is against the weight of the evidence, the trial court conducts its own review of the evidence to measure the results in terms of whether a miscarriage of justice has occurred. *Brown v. Syntex Laboratories, Inc.*, 755 F.2d 668, 673 (8th Cir.1985); *Fireman's Fund Insurance Co. v. AALCO Wrecking Co.*, 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). In reviewing a district court's order denying a new trial, appellate courts ordinarily defer to the discretion of the district court and reverse only upon a strong showing that such discretion has been abused. *Green v. American Airlines, Inc.*, 804 F.2d 453, 454–55 (8th Cir.1986); *Voegeli v. Lewis*, 568 F.2d 89, 94–95 (8th Cir.1977).

■ The jury's basic findings in this case were (1) that alternatives to Missouri Utilities' transmission line existed and (2) that Missouri Utilities acted reasonably in its dealings with the city on the wheeling issue. The evidence was conflicting concerning the viability of alternatives to the transmission of power over Missouri Utilities' transmission line and concerning the fairness of the conditions imposed by the utility in its negotiations with the city. The city's basic premise was that it was entitled to wheeling *and* to the favorable SFR-1 rate, and that any alternative which cost more than this option was not a viable one.

Defendants presented extensive expert testimony concerning at least five alternatives which Malden could have developed to

---

**5.** This fact was not disputed by the parties and    the court directed this finding for the jury.

obtain power from an outside source during the relevant time period: three possible connections to SWPA transmission lines and connection with either the M & A Cooperative or Arkansas Power & Light Company. There was evidence that SWPA had offered to connect its transmission lines to the city free of charge in the 1960's, but the city had refused the offer. The SWPA line which was intended for the City of Malden was in existence during the relevant time period, however, and was within a mile of the city limits. By the time of trial, the city had elected to pursue connection with SWPA transmission lines.

A representative of the M & A Cooperative, which had a transmission line within the city limits during the period at issue, also testified that M & A was willing and able to have the city connect with M & A's line. Finally, there was testimony that Malden could have connected with the facilities of the Arkansas Power & Light Company, which were within ten miles of the City of Malden. Defendants' engineers testified concerning the technical aspects of each of the five proposed connections, and other witnesses gave testimony concerning the relative costs of each alternative.

With respect to the reasonableness of Missouri Utilities' position on wheeling over its own transmission line, defendants presented evidence that the utilities could not economically offer wheeling in conjunction with the SFR–1 tariff. Defendants' witnesses testified that the SFR–1 rate was a unique tariff, which allowed Missouri Utilities to recover its costs only if the city purchased its full requirements from Missouri Utilities (with the exception of the peak summer months). Since wheeling power to Malden would reduce Malden's power purchases throughout the year, Missouri Utilities took the position that wheeling in conjunction with the SFR–1 rate was not possible. Instead, Missouri Utilities offered to continue full service under the SFR–1 rate, offered to wheel 100% of Malden's power from an alternative source for a basic wheeling charge, and offered to continue to supply a portion of Malden's power under a new rate which would provide for service and wheeling.

There was a definite conflict in the parties' perceptions of the fairness of defendants' offers and the availability of alternatives to the Missouri Utilities transmission line, but the resolution of such conflicts is properly the role of the jury. There is evidence to support the jury's findings concerning these issues, and we find no abuse of discretion in the trial court's decision to deny plaintiff's motion for a new trial based on the weight of the evidence presented in this case.

### B. The Trial Court's Instructions

Plaintiff also challenges the instructions given by the trial court on relevant market and on the intent required to establish a monopolization claim under section 2 of the Sherman Act.

The court instructed the jury that "[c]harges of monopolization can only be judged in the framework of the relevant market." There is no dispute in this case that the relevant product market is the sale of electric power. The court instructed the jury to determine the relevant geographic market by considering "the areas in which the sellers operate" and "the areas in which the purchasers can practically turn for the product."

Plaintiff contends this instruction confused the jury because the concept of geographic market is irrelevant to its bottleneck theory of monopoly, which in plaintiff's view focuses solely on the existence of practical alternatives to an essential facility. Our review of the "essential facilities" caselaw convinces us that the trial court did not err in placing plaintiff's bottleneck theory in the context of the relevant market. *See Aspen Highlands*, 738 F.2d at 1516, 1520–21, 1528–29; *Hecht*, 570 F.2d at 988–89, 992–93; *Otter Tail Power*, 331 F.Supp. at 58–60. In each of the above-cited cases, the court considered the relevant product and geographic markets in determining whether the defendant exercised monopoly control over the facility in question. In MCI's antitrust litigation against AT & T, the jury was expressly asked to determine whether MCI had proven AT &

T possessed monopoly power in the relevant market, in addition to questions concerning AT & T's refusal to interconnect MCI with its local facilities. *See generally MCI*, 708 F.2d at 1195–1209 (instructions and special verdict form). While none of these cases specifically approved the use of a relevant market instruction in the context of a bottleneck monopoly theory case, they suggest the concept is not as "irrelevant" as plaintiff contends.

Moreover, even assuming the primary focus in this case was on whether practical alternatives to the facility in question existed, the court's relevant market instruction led the jury to consider "the areas in which purchasers can practically turn for the product." More importantly, however, immediately after its instruction on relevant market, the trial court expressly presented plaintiff's bottleneck theory to the jury.[6] In special interrogatories, the jury was asked simply whether the city had proven by a preponderance of the evidence that Malden was unable practically, realistically, or economically to provide an alternative to the Missouri Utilities' transmission line. The court thus allowed the plaintiff to use the bottleneck theory as a means of proving the defendants possessed monopoly power in the relevant market, the first element of a section 2 monopolization claim.

█ A district court has broad discretion to frame instructions and special interrogatories to the jury, and as long as the entire charge fairly and adequately contains the law applicable to the case, the judgment will not be disturbed on appeal. *See*

*Garnes v. Gulf & Western Manufacturing Co.*, 789 F.2d 637, 642 (8th Cir.1986). We find no reversible error in the court's relevant market/bottleneck instructions in this case.

The jury's finding in response to these instructions that Malden had alternatives available to Missouri Utilities' transmission line effectively defeats the city's monopolization claim. The jury found there simply was no "bottleneck," and hence, defendants had no monopoly power. The jury was also asked, in a series of three special interrogatories, to evaluate defendant's conduct in responding to the city's request for wheeling. The jury found defendants had not unconditionally or unreasonably refused to wheel power to the city and that it would not be economical for defendants to wheel power under the city's terms. These two findings are also fatal to plaintiff's claim because it was plaintiff's burden to prove that wheeling under the SFR–1 rate was technically and economically feasible. *See Aspen Highlands*, 738 F.2d at 1521; *MCI*, 708 F.2d at 1133; *Hecht*, 570 F.2d at 993.

The jury finally found that defendants had not acted with the specific intent to maintain their monopoly by denying the city alternative sources of electric power. Plaintiff challenges the requirement that it show defendants acted with specific intent, arguing that only a general intent is required where defendants possess monopoly power. *See Aspen Highlands*, 738 F.2d at 1521 n. 16; *Paschall v. Kansas City Star Co.*, 727 F.2d 692, 696 (8th Cir.1984).

6. The court stated:

Monopoly power, that is, the power to control prices or the power to exclude or economically inhibit competitors, may be proven through what is known as a bottleneck monopoly. With respect to the bottleneck test, you may consider, in determining whether the defendant possesses monopoly power in the relevant market, the extent to which defendant controlled the transmission facilities available to plaintiff; that is, plaintiff's means of reasonably obtaining wholesale electricity. The control of wholesale supplies has been referred to as bottleneck control.

Bottleneck control is a matter of practical, economic alternatives. While there is almost always some kind of alternative for everything, you are only to consider realistic, economically practical alternatives. In this case, the City of Malden has argued that Missouri Utilities Company and Union Electric Company had a bottleneck monopoly because Missouri Utilities Company and Union Electric Company own the only transmission lines connected to Malden. If you find that Malden had no realistic, economically practical alternative means of obtaining wholesale electricity, then you must find that Missouri Utilities and/or Union Electric Company had a bottleneck monopoly.

Defendants concede that ordinarily under a section 2 monopolization claim a general intent is sufficient, but argue that a higher standard is necessary where defendants are regulated utilities. The Seventh Circuit has expressly adopted such a rule. *See MCI*, 708 F.2d at 1107–08 (reaffirming holding in *Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 984–85 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981)).

We question whether specific intent should be required in a civil monopolization case where the conduct at issue has neither been approved by nor subject to regulatory agency review.[7] We need not decide whether the court's specific intent instruction constituted error, however, because any such error must be viewed as harmless in light of the jury's finding that defendants did not possess monopoly power. *See Green v. American Airlines, Inc.*, 804 F.2d 453, 456 (8th Cir.1986); *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188, 203 (8th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *Flanigan v. Burlington Northern, Inc.*, 632 F.2d 880, 889 (8th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). Because plaintiff has failed to show that any alleged error in the trial court's instructions was prejudicial to its claim in the sense that it would have changed the result, plaintiff's request for a new trial on the basis of alleged error in the court's instructions must be rejected. *See Vanskike*, 665 F.2d at 203.

### C. Defense Counsel's Closing Argument

Plaintiff's final argument in support of its motion for a new trial is that defense counsel's closing argument improperly suggested that if the jurors did not agree unanimously that plaintiff had satisfied its burden of proof, then they must answer the special verdict questions "no." Plain-

tiff's counsel objected to these comments at the close of oral argument before the court had instructed the jury, and urged the court to include a specific response to defense counsel's statements by instructing the jury that if they could not agree on any answer, they should come back to the court for further instructions.

The court declined to instruct the jury as plaintiff had requested, but did state in its instructions that the jury "shall record as its findings [to the special verdict questions] only answers to which all jurors unanimously agree." The court also polled the jury at plaintiff's request after the verdict had been returned, and all jurors confirmed that their findings were unanimous.

■ Defense counsel's statements were improper and should not have been made. Nevertheless, to constitute reversible error, statements made in oral argument must not only be plainly unwarranted but also clearly injurious. *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1303 (8th Cir.1987); *Vanskike v. Union Pacific R.R.*, 725 F.2d 1146, 1149 (8th Cir.1984); *Wilfing v. General Motors Corp.*, 685 F.2d 1049, 1053 (8th Cir.1982). Plaintiff bears the burden of making a concrete showing of prejudice. *Vanskike*, 725 F.2d at 1149.

■ After reviewing the record, we cannot say that plaintiff's case was so prejudiced by the comments that the trial court's denial of a new trial amounts to an abuse of discretion. *See Tyler v. White*, 811 F.2d 1204, 1207 (8th Cir.1987); *Wilfing*, 685 F.2d at 1052–53; *Vanskike*, 725 F.2d at 1149. Defense counsel's comments were brief and were made in the context of a lengthy closing argument which emphasized the facts concerning the alternatives available to the city, the fairness of Missouri Utilities' conduct, and the evidence of damages that had been presented. The corrective action requested by plaintiff

---

**7.** FERC specifically refused to consider the challenged conduct in its decision approving Union Electric's merger with Missouri Utilities. *See* 25 Fed. Energy Reg. Comm'n Rep. (CCH) para. 61,394 (1983). FERC has limited authority to compel wheeling under the standards and pro-

cedures of sections 211 and 212 of the Federal Power Act, adopted by Congress in 1978. *See* 16 U.S.C. §§ 824j & 824k; *Florida Power & Light Co. v. FERC*, 660 F.2d 668, 672 n. 15 (5th Cir. 1981).

could have invited a hung jury, and the trial judge properly instructed the jury concerning their duty to record only unanimous answers—"yes" or "no"—to the special verdict questions. We decline to order a new trial solely on the basis of defense counsel's remarks.

## IV. PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

Plaintiff contends that despite the jury's verdict against it, the city should be entitled to recover attorney's fees in connection with the filing of its motion for preliminary relief, because only after the filing of this motion did defendants agree to wheel SWPA power to the city as of January 1, 1984. Section 16 of the Clayton Act provides:

> In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

15 U.S.C. § 26.

This Court has held that a lawsuit which prompts the defendant to act may qualify for an attorney's fee award. *United Handicapped Federation v. Andre*, 622 F.2d 342, 346–47 (8th Cir.1980); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 429–30 (8th Cir.1970). We agree that in this case plaintiff may be viewed as a "prevailing party" if plaintiff's lawsuit and plaintiff's attorney's efforts were "a necessary and important factor" in achieving the wheeling requested by plaintiff in its motion for preliminary relief. *See United Handicapped*, 622 F.2d at 346; *Southwest Marine, Inc. v. Campbell Industries*, 732 F.2d 744, 746–47 (9th Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984).

In denying plaintiff's fee request, however, the district court found as a factual matter that plaintiff had failed to establish that its lawsuit, rather than the parties' ongoing negotiations, had resulted in the use of Missouri Utilities' transmission line to wheel SWPA power to Malden. Defendants argue on appeal that the evidence shows wheeling service to Malden began on January 1, 1984, *in spite* of the city's lawsuit, and not because of it.

Our review of the record reveals, again, conflicting perceptions of the positions of the various parties. We find the district court was in the best position to evaluate the factual question presented by this conflict, and we decline to disturb the court's judgment that plaintiff should not be awarded attorney's fees in this case.

## V. CONCLUSION

The City of Malden brought this antitrust action against defendants on the theory that defendants' transmission line was the only practical option available to the city to obtain the electrical power needed to supply its customers and defendants had imposed unreasonable conditions on the city's access to that line. We have no doubt that the city believes it was unfairly treated by defendants. But the jury found that the city had other alternatives which feasibly could have been implemented and that Missouri Utilities had not arbitrarily prevented the city from wheeling power over its transmission line. While the trial before the Magistrate was not error-free, we find no basis for reversing the court's judgment based upon the jury's verdict and we decline to disturb the court's ruling with respect to attorney's fees. Accordingly, the judgment of the district court is, in all respects, affirmed.