The TOWNS OF ALEXANDRIA, MINNESOTA, et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Otter Tail Power Company, Intervenor.

The VILLAGE OF ELBOW LAKE, MINNESOTA, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Otter Tail Power Company, Intervenor.

Nos. 74–2099, 74–2100.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1976.

Decided April 15, 1977.

Donald R. Allen, Washington, D. C., with whom C. Emerson Duncan, II, and Dorothy R. Burakreis, Washington, D. C., were on the brief, for petitioners.

Philip R. Telleen, Atty., F. P. C., Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., F. P. C., Washington, D. C., were on the brief, for respondent.

Cyrus A. Field, Fergus Falls, Minn., with whom David F. Lundeen, Fergus Falls, Minn., was on the brief, for intervenor.

Before TAMM and ROBINSON, Circuit Judges, and JUSTICE,* United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

We are confronted on this review by two questions. One is whether the Federal Power Commission properly declined to pass on a municipality's claim of rate discrimination by an electric utility prior to completion of a full hearing designed to enable determination of a just and reasonable rate for the utility. The other is whether the Commission properly expanded the scope of the proceeding to assure that the rate would not discriminate or operate unreasonably against other municipal customers of the utility. We answer both questions in the affirmative.

## I

Otter Tail Power Company, a public utility subject to the Federal Power Act,[1] sells electricity at retail in several hundred communities in Minnesota and two adjoining states. For many years the Village of Elbow Lake, Minnesota, purchased its requirements from Otter Tail at retail rates. In 1966, the citizens of Elbow Lake voted to establish their own municipal distribution facilities, but Otter Tail refused to provide Elbow Lake with power at wholesale. Otter Tail was also unwilling to transmit—"wheel"—over its lines energy which Elbow Lake could have bought at wholesale from the Bureau of Reclamation of the Department of the Interior and various electric cooperatives. Thus isolated from these sources, Elbow Lake set up a generating plant for its distribution system and brought its case to the Commission, asking that Otter Tail be directed to interconnect with its system and supply it with wholesale power. In Opinion No. 551, the Commission initially granted a temporary connection,[2] which in Opinion No. 603 it later made permanent.[3]

Meanwhile, the Government instituted an antitrust action against Otter Tail in the District of Minnesota, charging monopolization of retail distribution of electricity in its service area. The District Court held that Otter Tail had endeavored to block communities from replacing its expiring retail distribution franchises with municipal distribution systems.[4] Prominent among the monopolistic techniques condemned was Otter Tail's refusal to sell energy at wholesale or to wheel power to proposed municipal systems in communities in which it retailed power.[5] The court enjoined these practices

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

1. Act of June 10, 1920, ch. 285, 41 Stat. 1063, as added by Act of Aug. 26, 1935, ch. 687, tit. II, pt. II, § 213(e), 49 Stat. 848, 16 U.S.C. § 824(e) (1970).

2. *Village of Elbow Lake v. Otter Tail Power Co.* (Opinion No. 551), 40 F.P.C. 1262 (1968), *aff'd sub nom., Otter Tail Power Co. v. FPC*, 429

F.2d 232 (8th Cir. 1970), *cert. denied,* 401 U.S. 947, 91 S.Ct. 923, 28 L.Ed.2d 230 (1971).

3. *Village of Elbow Lake v. Otter Tail Power Co.* (Opinion No. 603), 46 F.P.C. 675 (1971), *modified,* 473 F.2d 1253 (8th Cir. 1973).

4. *United States v. Otter Tail Power Co.,* 331 F.Supp. 54 (D.Minn.1971).

5. *Id.* at 58.

but specified in its judgment that Otter Tail "shall not be compelled . . . to furnish wholesale electric service or wheeling service to a municipality except at rates which are compensatory and under terms and conditions which are filed with and subject to approval by the" Commission.[6]

On direct appeal, the Supreme Court affirmed the decision in these respects,[7] but with a caution:

> We do not suggest, however, that the District Court, concluding that Otter Tail violated the antitrust laws, should be impervious to Otter Tail's assertion that compulsory interconnection or wheeling will erode its integrated system and threaten its capacity to serve adequately the public. . . . [T]he Commission may not order interconnection if to do so "would impair [the utility's] ability to render adequate service to its customers"[8] . . . . The District Court in this case found that the "pessimistic view" advanced in Otter Tail's "erosion study" "is not supported by the record."[9] Furthermore, it concluded that "it does not appear that Bureau of Reclamation power is a serious threat to the defendant nor that it will be in the foreseeable future."[10] Since the District Court has made future connections subject to Commission approval and in any event has retained jurisdiction to enable the parties to apply for "necessary or

appropriate" relief[11] and presumably will give effect to the policies embodied and in the Federal Power Act, we cannot say under these circumstances that it has abused its discretion.[12]

## II

When the Supreme Court so ruled, Elbow Lake was purchasing, as we have said, electricity from Otter Tail at wholesale. Promptly after the decision, Elbow Lake contracted with the Bureau of Reclamation for wholesale power and called upon Otter Tail to wheel it in. It then became incumbent upon Otter Tail to design, and upon the Commission to scrutinize, rates and other terms for the wheeling arrangement. Otter Tail asked the Commission to set a compensatory rate, which Otter Tail calculated at 5 mills per kilowatt hour.[13]

At the time, Otter Tail was wheeling preference power to 17 municipalities in Minnesota and South Dakota pursuant to a contract with the Bureau of Reclamation setting a wheeling rate of 1 mill per kilowatt hour, on quadrennial determinations by Otter Tail of excess transmission capacity.[14] It also contracted individually with municipalities for transmission firming service at 1.5 mills, discounted for customers with generation.[15] In response to Otter Tail's petition, Elbow Lake asserted that the 5-mill rate was unduly discriminatory

---

6. *Id.* (judgment Nov. 10, 1971, ¶ V) (unreported) Joint Appendix (J.App.) 497.

7. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 375–377, 93 S.Ct. 1022, 1028–1029, 35 L.Ed.2d 359, 366–367 (1973). In another aspect, bearing no relevance to the present review, the District Court's judgment was vacated and remanded for reconsideration. *Id.* at 379–380, 93 S.Ct. at 1030–1031, 35 L.Ed.2d at 369.

8. Quoting Federal Power Act, § 202(b), 16 U.S.C. § 824a(b) (1970).

9. Quoting *United States v. Otter Tail Power Co., supra* note 4, 331 F.Supp. at 64.

10. Quoting *id.*

11. Quoting *id.* (judgment Nov. 10, 1971, ¶ VII), J.App. 498.

12. *Otter Tail Power Co. v. United States, supra* note 7, 410 U.S. at 381–382, 93 S.Ct. at 1031–1032, 35 L.Ed.2d at 370 (citation omitted).

13. *Otter Tail Power Co.* (order accepting filing), 50 F.P.C. 1341 (1973). As summarized by the Commission, Otter Tail's petition sought determinations as to "(1) whether such an interconnection to provide wheeling service falls within the public interest and should be so ordered under the Federal Power Act; (2) just and reasonable rates for wheeling; and (3) a reasonable severance charge for abandonment of the present service, so as to prevent the fixed and embedded costs of such service from being unduly passed on and borne by remaining Otter Tail customers." *Id.* at 1342.

14. *Id.* at 1343.

15. *Id.* at 1342.

because it greatly exceeded the rates which Otter Tail charged the neighboring communities, and sought relief accordingly.[16]

By order issued October 31, 1973, the Commission held that Otter Tail's tendered rate was an initial rate for a new type of service.[17] The Commission explained:

> Although Opinion No. 603 [18] provided for the interim nature of Otter Tail's interconnection and wholesale service ordered therein and anticipated future sale of [Bureau of Reclamation] power to Elbow Lake, Otter Tail's submittal cannot realistically qualify as a change in rate schedule . . . because it effects a change in the nature of service to Elbow Lake by supersedence of all-requirements wholesale service by wheeling of [Bureau] power.
>
> The Otter Tail filing amounts to a new rate for a new type of service and should so qualify pursuant to Section 205 of the Federal Power Act [19] and Part 35.12 [20] of the Regulations issued thereunder.[21]

The Commission thus concluded that it "should (1) accept the filed rate as an initial rate schedule in order to implement wheeling service as directed, and (2) enter upon a hearing to determine the justness and reasonableness thereof." [22]

Elbow Lake applied for rehearing, arguing that the wheeling service afforded it differed in no way from that furnished the 17 municipalities under the Otter Tail-Bureau of Reclamation contract and associated special municipal service agreements with Otter Tail. Elbow Lake sought a survey of the wheeling services and approval of the 17-town rate for itself, with resultant treatment of Otter Tail's tendered rate as a request for a rate increase. The Commission denied rehearing:

> The Commission's exposition that it would not, without hearing, order Otter Tail to file a rate which differs from that submitted, does not, of course, preclude the Commission from ordering Otter Tail to file a different rate or conditioning the tendered rate appropriately *after* the conduct of a hearing thereupon. It was the intent of the Commission in fact to institute a hearing and investigation herein to best determine the very issues raised by Elbow Lake's allegations. Commission predetermination based upon the pleadings of whether the accepted rate is compensatory, just, reasonable, unduly discriminatory or preferential would be premature and unwarranted at this stage.[23]

Hearings before an administrative law judge then got under way, and had proceeded to completion on some issues, including discrimination and rate of return, when the judge felt it necessary to recommend reconsideration by the Commission of the scope of the remainder of the inquiry. While the

---

**16.** As stated by the Commission, "Elbow Lake assert[ed] (1) that Commission Opinion No. 603 [see note 3 *supra* ] establishing the interconnection determined the public interest question raised by Otter Tail, and (2) that the Otter Tail filing constitutes a rate schedule for wheeling service which is unduly discriminatory because the suggested rates fall far in excess of those on file for 17 municipalities for similar service. . . . Elbow Lake requests Commission (1) acceptance of Otter Tail's Petition as a rate filing and initiation of a hearing to determine the lawfulness thereof, and (2) approval of [Bureau of Reclamation] power transmission service at rates consistent with those on file for similar service." *Id.* at 1342.

**17.** *Id.* at 1343–1344.

**18.** See note 3 *supra* and accompanying text.

**19.** 16 U.S.C. § 824d (1970).

**20.** 18 C.F.R. § 35.12 (1976).

**21.** *Otter Tail Power Co.* (order accepting filing), *supra* note 13, 50 F.P.C. at 1343.

**22.** *Id.* at 1343–1344. The Commission noted two consequences of its action. The first was that Elbow Lake's power costs were immediately reduced from 16.8 mills per kilowatt hour, the wholesale rate it was paying, to 10.5 mills —5.3 mills for Bureau of Reclamation power plus 5.2 mills for wheeling. *Id.* at 1344. The second was that the Commission had "set in motion proceedings to determine if further reduction thereof is warranted, and whether the accepted rate is unduly discriminatory or preferential." *Id.*

**23.** *Otter Tail Power Co.* (order on rehearing), No. E–8152 (F.P.C. Dec. 28, 1973) (unreported), at 2, J.App. 696 (emphasis in original).

presentations to the judge were designed to establish the cost of service to Elbow Lake and a rate of return therefor, Otter Tail's wheeling contracts with some of the 17 towns had expired in the interim and all but three of the rest were approaching their terminal dates. During the hearings, Otter Tail had voiced its view that the long-since fixed 1-mill flat rate to the 17 towns was noncompensatory, and had manifested as its expectation, and later had declared as its intention, replacement of the 1-mill-rate contracts with service agreements specifying whatever rate the Commission eventually approved for Elbow Lake.[24] Since none of the 17 towns was a party to the proceeding, and since some possibly were even unaware of it, the judge recommended that the Commission's hearing order "be revised to show that the scope of the hearing is to cover the rate for the transmission service to all communities receiving such service, including the 17 towns now being served in addition to Elbow Lake; that the 17 towns . . . be formally notified . . . as in the case of any rate change; that they be permitted to participate and intervene if they are so advised; and that the parties be called upon to furnish copies of their cost studies and exhibits to any who intervene and wish to participate in the hearing . . .."[25] The judge added:

Alternatively, if the foregoing program is not approved, the Commission may consider whether, in the interest of over-all saving, to permit the "phasing" of the presently-ordered proceeding, so as to come to decision first on the sole issue of discrimination (hearing on which has now been completed). The point is that Elbow Lake most earnestly and repeatedly has asserted the present rate as charged

them since last November is unduly discriminatory and unlawful, quite regardless of the rate level and whether or not it is a "compensatory" one, as called for by the District Court's judgment. Equally earnestly and repeatedly the Company denies the discrimination, asserting a significant difference in the type of service rendered. That issue is now ready for briefing, and should its resolution go against the Company there will be no occasion to hear the cost of service evidence, at least until such time as all 18 towns are put on the same footing.[26]

Over Elbow Lake's objection, the Commission agreed that the proceeding should be expanded as recommended by the administrative law judge. In its order of November 29, 1974, the Commission explained:

[I]t is clear that this proceeding is likely to affect many municipalities in addition to Elbow Lake. In order that those municipalities be treated fairly, it is essential that the issue in this case be redefined so as to refer to the legality of the rate for wheeling power provided by Otter Tail to any and all municipalities receiving wheeling service. It is also essential that the municipalities in question be given notice of this proceeding and an opportunity to participate fully in it. We so provide in this order.[27]

The Commission disagreed with Elbow Lake's argument "that the proceeding should not now be expanded but should instead be decided promptly on the basis of the question of discrimination."[28] Said the Commission,

[i]f that were done, Elbow Lake might not be required to pay the current rate to

---

**24.** Otter Tail told the Commission that

[a]t such time as a compensatory fully allocated cost rate for firm transmission service is determined in this proceeding, such compensatory fully allocated cost rate for firm transmission service will be made available to any municipality within the service area of Otter Tail Power Company as an initial rate for firm transmission service. . . . It is anticipated that the rate so established will be the only rate then available to a municipality for transmission service.

*Otter Tail Power Co.* (order expanding hearing), 52 F.P.C. 1007, 1008 (1974).

**25.** *Otter Tail Power Co.*, No. E–8152 (F.P.C. Sept. 24, 1974) (unreported), J.App. 742.

**26.** *Id.*, J.App. 742–743.

**27.** *Otter Tail Power Co.* (order expanding hearing), *supra* note 24, 52 F.P.C. at 1008.

**28.** *Id.*

Otter Tail for so long a period, and such rate is not now subject to refund. But Otter Tail points out that if its wheeling rate to Elbow Lake becomes the rate applicable to all of its municipal customers as is Otter Tail's expressed intention, then the question of discrimination becomes moot. Although we are unwilling now to say that the question of discrimination would then disappear, it is clear to us that the question would at least be subject to different facts and considerations. Accordingly, a decision on the discrimination question at this time would be premature.[29]

Elbow Lake applied for rehearing of that order, but the Commission adhered to its decision to expand the hearing and defer determinations on the issue of discrimination.[30] The Commission granted a petition by ten of the towns to intervene[31] and, in response to their own objection to the Commission's proposal, elucidated the nature of further hearings:

> The Towns also apply for rehearing of [the order expanding the scope of the hearing], arguing that we cannot hold hearings to determine the justness and reasonableness of the proposed Otter Tail rate to them in the absence of an appropriate tariff filing by Otter Tail. We agree with much of the Towns' argument. We agree that "Otter Tail's announcement" as to its intentions "is no substitute for a proper filing", and that "no rate may be changed if it is not on file with the Commission". We acknowledged in our [hearing-expansion] order

that Otter Tail had not yet filed rate changes with respect to the 17 towns, and because that is so, we further stated that "we may not be able, in this proceeding, to dispose finally of all aspects of the foreseen rate changes as they apply to each of the communities". Differently stated, our conclusion in this case as to the rate that Otter Tail may charge Elbow Lake will not result, without more, in a change in the rate that Otter Tail may charge any or all of its other 17 municipal customers. Certainly any rate change as to any such customer must begin with a rate filing, and certainly no rate filing by Otter Tail has here occurred, except in the case of Elbow Lake.[32]

And, once again rejecting Elbow Lake's effort to obtain immediate resolution of the discrimination question, the Commission said:

> Elbow Lake argues that the question whether it is the victim of discrimination is ripe for decision now, and that our deferring a decision results in irreparable harm to Elbow Lake because the rate charged it by Otter Tail is not subject to refund. Elbow Lake rightly points out that we can decide and have decided questions of discrimination without undertaking a full blown rate case. The difficulty here, however, is that the question of discrimination cannot be segregated, for our responsibility, as we stated in

**29.** *Id.* The Commission further stated:
> Of course we recognize that Otter Tail has not yet filed rate changes in connection with the wheeling service it now provides for the 17 towns. At such time as it does so, particular questions in connection with particular communities and their contracts may arise. We cannot now anticipate all of those questions, and accordingly we recognize that we may not be able, in this proceeding, to dispose finally of all aspects of the foreseen rate changes as they apply to each of these communities. But Otter Tail has announced that the rate to Elbow Lake that is established as a result of this proceeding will, at some future time, become "the only rate then available to a municipality for transmission service". That being so, it is our purpose now

> to cause that rate issue as it affects all 18 towns to be heard and decided in the instant docket. While, as we have stated, this may not result in a final resolution of all questions as to all 18 towns, we intend herein to resolve the rate question as fully as we possibly can. We do not mean to turn to that question a second time, and certainly not 17.
> *Id.* at 1008–1009.

**30.** *Otter Tail Power Co.* (order denying rehearing), 52 F.P.C. 1572 (1974).

**31.** *Id.* at 1573.

**32.** *Id.*

our order of October 31, 1973,[33] is to determine a rate for Otter Tail's service to Elbow Lake that is not only non-discriminatory but also "compensatory . . . just and reasonable". . . . . Inasmuch as the Administrative Law Judge's referral to us makes clear that cost of service evidence, among other things, remains to be heard, there is not yet available to us a record that permits us to fix a rate that demonstrably meets all of the necessary tests.[34]

Elbow Lake and the ten towns now petition separately for review.[35]

## III

The Federal Power Act commands relevantly that "[a]ll rates and charges . . . for . . . the transmission . . . of electric energy subject to the jurisdiction of the Commission . . . shall be just and reasonable,"[36] and "any such rate or charge that is not just and reasonable is [t]hereby declared to be unlawful."[37] The Act specifies additionally that "[n]o public utility shall, with respect to any [such] transmission . . ., maintain any unreasonable difference in rates [or] charges . . . ."[38] The Commission is required, "after a hearing" and upon a finding "that any rate [or] charge . . . for any [such] transmission . . . is unjust, unreasonable, unduly discriminatory or preferential," to "determine the just and reasonable rate [or] charge . . . to be thereafter observed and in force, and . . . fix the same by order."[39]

■ Continually since Otter Tail filed its 5-mill wheeling rate for Elbow Lake, the latter has pressed a discrimination claim based upon its wide divergence from the 17-town rate.[40] And Elbow Lake is emi-

**33.** See text *supra* at notes 17–22.

**34.** *Otter Tail Power Co.* (order denying rehearing), *supra* note 30, 52 F.P.C. at 1573.

**35.** We consider Elbow Lake's arguments in Part III hereof, and the towns' contentions in Part IV.

**36.** "All *rates and charges made, demanded, or* received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." Federal Power Act § 205(a), 16 U.S.C. § 824d(a) (1970).

**37.** *Id.,* quoted *supra* note 36.

**38.** "No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (I) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." Federal Power Act § 205(b), 16 U.S.C. § 824d(b) (1970).

**39.** "Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." Federal Power Act § 206(a), 16 U.S.C. § 824e(a) (1970).

**40.** Otter Tail, on the other hand, contends that its contract with the Bureau of Reclamation for wheeling service to the 17 towns was vitiated by the Supreme Court's decision in the antitrust case. See Part I *supra.* The shortcomings of that claim have already been exposed. On January 29, 1975, Otter Tail tendered to the Commission a schedule for firm transmission service to two of the towns at the 5-mill rate. The Commission rejected the filing as premature because the term of the Bureau-Otter Tail contract had not then expired. *Otter Tail Power Co.,* No. E–9240 (F.P.C. Mar. 31, 1975). Otter Tail reasserted its theory in a petition for rehearing, which the Commission denied. *Otter Tail Power Co.,* No. E–9240 (F.P.C. May 16, 1975). Subsequently, on June 23, 1975, Otter Tail sought to raise from 1 mill to 5 mills the transmission rate for the remaining 15 of the 17 towns. The Commission likewise disallowed that filing, but gave notice that it was initiating an investigation of the Bureau-Otter Tail contract pursuant to § 206 of the Act, *Otter Tail Power Co.,* No. E–9507 (F.P.C. Aug. 29, 1975), and thereafter declined to rehear that ruling. *Otter Tail Power Co.,* No. E–9507 (F.P.C. Oct.

nently correct in its position that an unjustifiable difference in rates for substantially similar service works an unlawful discrimination.[41] The appropriate inquiry, however, in the present posture of this case is not whether the rate to Elbow Lake is actually discriminatory but whether the Commission was compelled to proceed immediately to ascertain whether it is or not.

The Act, while explicitly imposing upon the Commission a duty to rectify rate discrimination, is silent as to the point in the administrative process at which that obligation is to be discharged. We have not been referred to, nor have we found, either

legislative history or judicial precedent bearing directly on the question. But as in the recent past we have declared, the Act's "primary aim is the protection of consumers from excessive rates and charges."[42] and certainly that wholesome purpose is best served by expeditious resolution of rate-discrimination claims. Moreover, as the Commission acknowledges,[43] it has had past occasion to hold that patent discrimination may be removed without awaiting the outcome of a full-blown rate investigation.[44] We perceive no obstacle[45] to that course when the discrimination issue is discrete and the administrative record is sufficiently

---

10, 1975). On Otter Tail's petition for review of these orders, the Eighth Circuit affirmed, stating in part:

> We are unconvinced by Otter Tail's central contention that its existing contractual responsibility, as established by the [Bureau]-Otter Tail agreement, was vitiated by the Supreme Court's decision . . . .. The Supreme Court rendered invalid only the provision of the contract that permitted Otter Tail to refuse to sell power at wholesale rates to proposed municipal systems in the communities where it had been transmitting power at retail rates. The Court held that such a provision, which was designed to prevent municipal systems from eroding Otter Tail's monopolistic position, constituted a per se violation of the Sherman Act . . . .. Although one provision of the [Bureau]-Otter Tail contract was invalidated, there is a clear policy favoring the severance of invalid restrictions appearing in agreements in restraint of trade and supporting the continued validity of the remainder of such contracts. . . . The determination of the viability of the [Bureau]-Otter Tail contract involved a question of law, rather than a dispute of fact, that the [Commission] could resolve without an evidentiary hearing.

*Otter Tail Power Co. v. FPC,* 536 F.2d 240, 242 (8th Cir. 1976) (footnote omitted). We are in full agreement with the court's reasoning.

The Bureau-Otter Tail contract expired on December 31, 1976. That does not mean, however, that Elbow Lake's bid for a ruling on the discrimination issue is aborted. Although, as we later point out, see note 65 *infra,* Otter Tail has now filed a new rate, comparable to Elbow Lake's rate, for transmission service to the towns, the town-rate is currently under suspension by order of the Commission. Consequently, the differing rates paid by Elbow Lake and the towns remain as they were before expiration of the Bureau-Otter Tail contract. As the Commission concedes, and we agree, there can be no present argument for mootness. We

intimate no view as to whether, but for the suspension, such an argument might be successful.

41. *E. g., St. Michaels Utils. Comm'n v. FPC,* 377 F.2d 912, 915 (4th Cir. 1967); *Otter Tail Power Co.,* 2 F.P.C. 134, 141, 145 (1940). *Cf. United States v. Chicago Heights Trucking Co.,* 310 U.S. 344, 351, 60 S.Ct. 931, 935, 84 L.Ed. 1243, 1247–1248 (1940).

42. *Municipal Light Bds. v. FPC,* 146 U.S.App. D.C. 294, 301, 450 F.2d 1341, 1348 (1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). Compare *Gulf States Utils. Co. v. FPC,* 411 U.S. 747, 758, 93 S.Ct. 1870, 1877, 36 L.Ed.2d 635, 643–644 (1973). Sections 205 and 206 of the Federal Power Act have substantial counterparts in §§ 4 and 5 of the Natural Gas Act, Act of June 21, 1938, ch. 556, 52 Stat. 821, as amended, 15 U.S.C. §§ 717 *et seq.* (1970); *FPC v. Sierra Pac. Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 371–372, 100 L.Ed. 388, 394 (1956), and that legislation subserves the same prime purpose. *Atlantic Ref. Co. v. Public Serv. Comm'n,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312, 1319 (1959); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333, 349 (1944).

43. See text *supra* at note 34.

44. *Otter Tail Power Co., supra* note 41, 2 F.P.C. at 149.

45. That the Commission had already allowed Otter Tail's new-rate filing for Elbow Lake did not preclude otherwise appropriate relief on its rate-discrimination allegation, for "a rate schedule, though previously accepted by the Commission for filing, is not unalterable when corrections are clearly in order." *City of Cleveland v. FPC,* 174 U.S.App.D.C. 1, 12, 525 F.2d 845, 856 (1975) (footnote omitted.) *Cf. Municipal Light Bds. v. FPC, supra* note 42, 146 U.S.App.D.C. at 298, 450 F.2d at 1345.

developed to enable a sound determination.[46]

 That, however, is not nearly the situation here. Otter Tail insists that the 17-town rate[47] would operate confiscatorily were it to measure the charge for wheeling power to Elbow Lake,[48] and we cannot dismiss that possibility as merely fanciful.[49] The 17-town rate was fixed in 1955 by a contract between Otter Tail and the Bureau of Reclamation.[50] The contract had not been subjected to a rate investigation prior to the instant proceeding,[51] and consequently the 17-town rate had never been found to be just and reasonable.[52] Elbow Lake argues that the rate must be regarded as compensatory because Otter Tail voluntarily made it available to the towns for a service similar to its own. But aside from a dispute as to whether the wheeling service provided the 17 towns is comparable to that afforded Elbow Lake,[53] the incontrovertible fact is that the contract rate was set more than twenty years ago in a radically different economic climate. We cannot shut our eyes to the notorious fact that the cost of well-nigh everything has risen dramatically over the past two decades,[54] nor can we

**46.** Speaking to a somewhat different question, the Fifth Circuit has observed:

There is nothing in Section 206(a) which prohibits the Commission from eliminating an unlawful practice without simultaneously holding a full rate hearing to prescribe a proper rate. We perceive no inseparability of the forbidden practices from the Company's rates. The Commission is fully authorized by this section to deal solely with an unjust or unreasonable practice as such.

*Georgia Power Co. v. FPC,* 373 F.2d 485, 487 (5th Cir. 1967). Cf. *FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 150–155, 83 S.Ct. 211, 214–216, 9 L.Ed.2d 199, 203–206 (1962).

**47.** We refer to the 1-mill rate paid by all 17 towns for wheeling service under Otter Tail's contract with the Bureau of Reclamation. Some of the towns pay an additional 1.5 mills under separate contracts with Otter Tail.

**48.** As we understand Elbow Lake's litigative objective, it would have the Commission reject Otter Tail's newly-filed rate for it and substitute the 1-mill rate.

**49.** We wish to emphasize that a utility can unlawfully discriminate by maintaining different rates for similar service although all of the rates are just and reasonable. "[T]here is no single cost-recovery rate, but a zone of reasonableness: 'Statutory reasonableness is an abstract quality represented by an area rather than by a pinpoint. It allows a substantial spread between what is reasonable because too low and what is unreasonable because too high.'" *FPC v. Conway Corp.,* 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626, 633 (1976), quoting *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912, 919 (1951). Thus

"one rate in its relation to another rate may be discriminatory, although each rate per se, if considered independently, might fall within the zone of reasonableness. There is con-

siderable latitude within the zone of reasonableness insofar as the level of a particular rate is concerned. The relationship of rates within such a zone, however, may result in an undue advantage in favor of one rate and be discriminatory insofar as another rate is concerned. When such a situation exists, the discrimination found to exist must be removed."

*FPC v. Conway Corp., supra,* 426 U.S. at 278, 96 S.Ct. at 2004, 48 L.Ed.2d at 633, quoting *Otter Tail Power Co., supra* note 41, 2 F.P.C. at 149.

**50.** Counsel for the Commission accurately describes the agreement as "essentially a fixed-rate, long-term contract encompassing interconnections, a wide range of bulk power transactions and reciprocal transmission services between" Otter Tail and the Bureau. Brief for Respondent at 15 n. 6. See also note 52 *infra.*

**51.** See note 40 *supra.*

**52.** Beyond that, Otter Tail claims that the Bureau-Otter Tail contract provides other benefits justifying the 1-mill rate.

**53.** While Elbow Lake premises its discrimination claim on their comparability, Otter Tail asserts that Elbow Lake is rendered "firm" transmission service while the 17 towns receive "excess capacity" wheeling service, and that the economic consequences of these arrangements are quite different. As we read the Commission's decision, see Part II *supra,* the question remains open.

**54.** Elbow Lake relies heavily upon the Commission's holding in *Otter Tail Power Co., supra* note 41, that rate discrimination found there could be addressed and removed without conducting a full rate hearing. Otter Tail had voluntarily contracted with several municipalities for wholesale electric service at different

ignore Otter Tail's inability during that period to unilaterally alter the 1955 rate.[55] Thus we are not persuaded that the Commission erred in declining to accept that rate as the benchmark for recompense to Otter Tail for the wheeling service supplied Elbow Lake.[56]

Otter Tail's entitlement to a compensatory rate springs not only from the provisions of the Act [57] but also from the judicial order that Otter Tail furnish wheeling service to Elbow Lake.[58] The judgment of the District Court incorporating that directive specifies that Otter Tail

shall not be compelled by the Judgment in this case to furnish wholesale electric service or wheeling service to a municipality except at rates which are compensatory and under terms and conditions which are filed with and subject to approval by the . . . Commission.[59] The Supreme Court, in its affirming decision, noted that "the District Court has made future connections" required of Otter Tail "subject to Commission approval." [60] So, as the Commission said when it denied rehearing of its hearing-expansion order, [t]he . . . District Court ruling determined that initiation of wheeling ser-

rates, and the Commission found "patent discrimination" and ordered a uniform rate set at the lowest level available to any customer for similar service. The Commission felt that the discrimination appeared sufficiently from the rate differentials among the contracts, which had been individually negotiated within a relatively short period of time—six of nine contracts have become effective within a 19-month period, and all within a space of four and one-half years. 2 F.P.C. at 153–156. The Commission observed "that the record is barren of evidence of cost of service to these customers," *id.* at 146, and that "there is nothing before us to show that [Otter Tail] voluntarily undertook to serve [the most favored municipality] under such conditions as would result in confiscation of [its] property." *Id.* Contrastingly, the 17-town rate in the case at bar was set more than 20 years ago in an economic milieu which we cannot fail to recognize as vastly different from that prevailing today.

**55.** It is settled law that a rate set by a contract cannot be changed by the unilateral act of either party thereto during the contract term. *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC),* 390 U.S. 747, 820–822, 88 S.Ct. 1344, 1387–1389, 20 L.Ed.2d 312, 366–367 (1968); *FPC v. Sierra Pac. Power Co., supra* note 42, 350 U.S. at 353, 76 S.Ct. at 371–372, 100 L.Ed. at 394; *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 343, 76 S.Ct. 373, 380, 100 L.Ed. 373, 394 (1956). True it is that notwithstanding this principle—the so-called *Mobile-Sierra* doctrine—the Commission is empowered to alter contract rates in circumstances of unequivocal public necessity. *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra,* 390 U.S. at 822, 88 S.Ct. at 1388–1389, 20 L.Ed.2d at 367; *FPC v. Sierra Pac. Power Co., supra* note 42, 350 U.S. at 353–355, 76 S.Ct. at 371–373, 100 L.Ed. at 394–395. But "it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its im-

provident bargain." *Id.* at 355, 76 S.Ct. at 372, 100 L.Ed. at 395 (citation omitted).

We are mindful that Otter Tail has long since been free to request agreement by the Bureau of Reclamation to an increase in the contract rate. That prerogative is incidental to any contractual arrangement, and is not tantamount to power to unilaterally make the change. We could not, without utterly discarding the *Mobile-Sierra* doctrine, attach particular significance to Elbow Lake's complaint that Otter Tail has not sought to secure the Bureau's consent to modification of the contract rate. Nor are we impressed by the argument that Otter Tail could have asked the Commission to raise the rates specified in its supplemental contracts with the towns.

**56.** We cannot accept Elbow Lake's additional argument that the invalidation in the antitrust litigation of a portion of the Bureau-Otter Tail contract establishes the remainder of that contract as the definition of Otter Tail's obligation to wheel power to Elbow Lake. The antitrust decisions nullified provisions of the contract which Otter Tail relied upon as justification for not providing service, but neither the District Court nor the Supreme Court set a rate for Elbow Lake. On the contrary, the District Court required, and the Supreme Court approved, the service "at rates which are compensatory and under terms and conditions which are filed with and subject to approval by the . . . Commission." See text *infra* at note 59.

**57.** See notes 36–39 *supra* and accompanying text.

**58.** See Part I *supra.*

**59.** *United States v. Otter Tail Power Co., supra* note 4 (judgment Nov. 10, 1971, ¶ V), J.App. 497.

**60.** See text *supra* at note 12.

vice falls within the public interest. It left for the Commission to give effect to that mandate to implement wheeling service to Elbow Lake by accepting and determining rates therefor which are compensatory, nondiscriminatory, just and reasonable.[61]

It is evident that the mandate cannot be obeyed without a fuller hearing leading to determination of a just and reasonable rate for the wheeling service that Elbow Lake now enjoys. The Commission put its finger on the crux of the problem when it stated that "[t]he difficulty here . . . is that the question of discrimination cannot be segregated" from the question of a just and reasonable rate for Otter Tail.[62] To be sure, Elbow Lake is entitled to a nondiscriminatory rate but Otter Tail, we repeat, is entitled to a compensatory rate; as put by the Commission, its "responsibility . . . is to determine a rate for Otter Tail's service to Elbow Lake that is not only nondiscriminatory but also 'compensatory . . . just and reasonable.' "[63] These twin objectives can, of course, be achieved once the administrative record on a just and reasona-

ble rate is completed. But, as the Commission found, "[i]nasmuch as the Administrative Law Judge's referral to [the Commission] ma[de] clear that cost of service evidence, among other things, remain[ed] to be heard," the inevitable conclusion was that "[there was] not yet available to [the Commission] a record that permit[ted] [it] to fix a rate that demonstrably meets all of the necessary tests."[64] As we review the matter, the Commission must be sustained on this branch of the litigation.

### IV

The petitioning towns—ten of the 17—also complain of the order by which the Commission expanded the scope of the hearing to enable consideration of the broader implications of the rate to be set for Elbow Lake. Pointing out that Otter Tail had not filed a proposal to change the rate charged them, the towns contend that the order violates the ratemaking scheme of the Act and their right to proper notice of the rate against which they must defend.[65] We cannot accept this position.

---

**61.** *Otter Tail Power Co.* (order denying rehearing), *supra* note 30, 52 F.P.C. at 1573.

**62.** See text *supra* at note 34.

**63.** See text *supra* at note 34.

**64.** See text *supra* at note 34.

**65.** After earlier unsuccessful attempts to increase the rate for transmission service *to the* towns, see note 40 *supra*, Otter Tail recently filed a new rate for that service, effective upon expiration of the Bureau-Otter Tail contract. The rate, we are informed, is comparable to Elbow Lake's 5-mill rate. All of the ten petitioning towns, save one no longer served by Otter Tail, are parties to the proceeding addressing the new rate, which by Commission order is currently in suspension. With these developments, both Otter Tail and the Commission have moved, on grounds of mootness, to dismiss from this litigation the towns' complaint respecting their inclusion in the Elbow Lake proceeding as expanded. We think, however, that while undoubtedly the latest rate-filing against the towns has removed one of their objections, another remains to keep the controversy very much alive.

The towns' opposition to implication in the expanded Elbow Lake proceeding has rested

partly upon the claim that without the formal filing of a rate specifically applicable *to* them, they did not know just what rate they would have to defend against in the expanded proceeding. The new filing designating the rate that Otter Tail would have them pay eliminates *so much of the towns'* argument, if indeed Otter Tail's previously-announced proposal to eventually charge them the 5-mill rate had not already done so. See note 24 *supra* and accompanying text. But, on the premise that a rate for the towns would inexorably emanate from the expanded proceeding, they also assert that the filing of such a rate was a jurisdictional prerequisite to exertion of the Commission's ratemaking authority against them in that proceeding, and thus to their involvement therein at all. Brief for Petitioner's at 31–34, 37–38. See also text *supra* at note 32. That issue persists, *for so far as we are advised* the Commission has not professed any intention whatever of rescinding the expansion order, and we can only presume that the expanded proceeding will be utilized as originally planned. If the *towns are not to* prevail, it is because their position lacks merit and not because the issue has disappeared. We accordingly deny the motion to dismiss for mootness.

It should be noted at the outset that the Commission promulgated the hearing-expansion order in an effort to safeguard the very right which the towns invoke. Otter Tail had made known its intention to eventually limit all communities receiving wheeled power to the type of service provided Elbow Lake and to the rate which the Commission would establish therefor.[66] This prompted the administrative law judge to raise with the Commission the question whether the proceeding should be enlarged to enable participation by the towns.[67] Realizing that the controversy between Otter Tail and Elbow Lake was "likely to affect many municipalities in addition to Elbow Lake," the Commission, "[i]n order that these municipalities be treated fairly," deemed it "essential that the issue in this case be redefined so as to refer to the legality of the rate for wheeling power provided by Otter Tail to any and all municipalities receiving wheeling service," and "also essential that the municipalities in question be given notice of this proceeding and an opportunity to participate fully in it."[68] In our view, the Commission acted commendably in thus exercising its discretion to protect the potentially affected communities.

The towns' resistance to the hearing-expansion order, and thus their several arguments, seem to stem primarily from their understanding that the expanded proceeding will produce a new rate for them. We cannot be positive as to the extent of use of that proceeding, particularly in light of recent developments,[69] but as we read the expansion order in no event will it have that purpose or effect. The Commission acknowledged that Otter Tail's revelation of their intended fate could not substitute for a tariff filing undertaking to alter the rate applicable to them;[70] indeed, the Commission emphasized that "the rate that Otter Tail may charge Elbow Lake will not result, without more, in a change in the rate that Otter Tail may charge any or all of its other 17 municipal customers."[71] And because "any rate change as to any such customer must begin with a rate filing," and since "no rate filing by Otter Tail [had then] occurred, except in the case of Elbow Lake,"[72] the Commission "recognize[d] that [it might] not be able, in this proceeding, to dispose finally of all aspects of the foreseen rate changes as they apply to each of these communities."[73] Although, as the Commission realized, its efforts "may not result in a final resolution of all questions as to all 18 towns," it did "intend herein to resolve the rate question as fully as [it] possibly can."[74]

It may safely be said, then, that no rate effective for the towns will emerge from the expanded proceeding, but that expansion of the hearing, assuming that it endures,[75] will foster two principal goals. One, to which we have adverted, is a desirable measure of protection for the towns. The other, as the Commission indicated, is the maximum possible administrative resolution of the continuing conflict between the utility and the towns. In settling the issues between Otter Tail and Elbow Lake, the Commission expects to put to rest at least some of the issues in which the other towns share an interest with Elbow Lake. This will be done to the extent, but only to the extent, that common questions are conducive to consideration and decision in the expanded proceedings. Other significant aspects of the towns' eventual rate will have to be deferred to the newly-instituted formal ratemaking proceeding.[76]

66. See note 24 *supra* and accompanying text.

67. See text *supra* at note 25.

68. See text *supra* at note 27.

69. See note 65 *supra*.

70. See text *supra* at note 32.

71. See text *supra* at note 32.

72. See text *supra* at note 32.

73. See note 29 *supra*.

74. See note 29 *supra*.

75. See text *supra* at note 69.

76. See note 65 *supra* and 79 *infra*.

We perceive no legal obstacle foreclosing the Commission from this innovative approach. Surely the Commission is not to be criticized for extending to the towns the opportunity to voice their concerns over developments that touch them as well as Elbow Lake. Nor can the Commission be faulted for seeking the highest degree of administrative efficiency by avoiding the resurrection of common issues in succeeding litigation involving the only rate and type of service that Otter Tail will offer its wheeling customers. As we admonished in a closely analogous context, "[s]uch redundancy is wasteful not only of the time and resources of [Commission] members and staff, but also of the resources of the parties—costs that must in the last analysis be borne by the consumer." [77] It may well be that the Commission's technique will "permit maximum benefit to be drawn from the initial, consolidated proceeding[,] [a]nd . . . represent . . . the minimum necessary to assure protection of the statutory rights of [Otter Tail's wheeling] customers . . . ." [78] At the very least, in our view, it deserves a trial.[79]

The orders under review are

*Affirmed.*

---

**77.** *Municipal Elec. Util. Ass'n v. FPC*, 158 U.S. App.D.C. 188, 194, 485 F.2d 967, 973 (1973). There we approved the Commission's acceptance of a § 205 rate-filing affecting several communities, which in some instances preceded by more than 90 days the permissible effective dates.

**78.** *Id.* at 197, 485 F.2d at 976.

**79.** In affirming the Commission, we do not discount the effort of the towns, including Elbow Lake, to draw their longstanding contest with Otter Tail to a conclusion. But "[a]dministrative procedures fail of their fundamental purpose if the goal of expedition is bought at the sacrifice of reasoned decision-making and substantial fairness to the parties concerned." *Id.* at 194, 485 F.2d at 973. It will remain the Commission's responsibility to pursue with equal vigor all three of these objectives in the pending proceedings to the fullest extent that they can be harmonized.